# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA  :

    v.  :  CRIMINAL NO. 14-541

ERIC C. OPITZ

## O R D E R

AND NOW, this ___ day of October 2014, upon consideration of the United States' Motion to Revoke Bail (the "Motion"), made pursuant to 18 U.S.C. § 3148(b) , and having held a hearing on the Motions, it is ORDERED and ADJUDGED that the Motion to Revoke Bail is hereby GRANTED.

The Court finds that there is probable cause to believe that defendant Eric C. Opitz violated the conditions of his release by committing new crimes, and that it is unlikely that the defendant will abide by any condition or combination of conditions of release. 18 U.S.C. § 3148(b)(2)(B).

The Court makes the following findings of fact:

1. On June 5, 2014, defendant Eric C. Opitz was arrested on a complaint and warrant charging health care fraud, in violation of 18 U.S.C. §1347; wire fraud, in violation of 18 U.S.C. §1343; mail fraud, in violation of 18 U.S.C. §1341; and the distribution of controlled substances, in violation of 21 U.S.C. § 841. The allegations were based on evidence that defendant Opitz sold, and attempted to sell, human growth hormone ("HGH") and anabolic steroids, a Schedule III controlled substance, to an undercover law enforcement officer in October 2013, December 2013, April 2014 and June 2014. The undercover agent responded to Opitz's advertisement for HGH on the internet site Craigslist. The agent told Opitz that he

wanted to build strength and muscle mass. Opitz obtained the HGH and steroids that he sold to the undercover agent through Medicare Part D.

2. Following his arrest on June 5, 2014, defendant Opitz was released on $50,000 O/R bond and other conditions including that he would not commit federal crimes during the period of release.

3. On October 8, 2014, an indictment was unsealed, charging defendant Opitz with health care fraud, in violation of 18 U.S.C. §1347 (10 counts); mail fraud, in violation of 18 U.S.C. §1341 (3 counts); the distribution of anabolic steroids, a Schedule II controlled substance, in violation of 21 U.S.C. § 841 (3 counts); and the distribution of human growth hormone, in violation of 21 U.S.C. § 333(e) (4 counts).

4. Further investigation since Opitz's arrest on the complaint and warrant has revealed that his criminal conduct was more extensive and more dangerous than previously known, and may have involved children. For example, in a recorded conversation on May 30, 2014[1], Opitz told an undercover agent that he sold HGH to a 12 year old girl.

5. While on release, Opitz continued to defraud Medicare and put the public at risk. In early September 2014, agents became concerned after learning that Opitz had tried repeatedly to obtain early refills of his HGH prescriptions. According to Special Agent Gene Fayer, HHS-OIG, based on his experience, individuals who sell their prescription drugs often attempt to obtain early refills because they are aggressively selling and have run out of "inventory."

6. Between June 12, 2014 and September 10, 2014, Opitz contacted

---

[1] Call transcribed on or about September 22, 2014.

Highmark Inc., a Medicare Part D provider, and/or Walgreens Specialty Pharmacy, who in turn contacted Highmark, approximately 15 times asking for HGH to be delivered to him ahead of the 30 day auto ship schedule. Prior to this, Opitz had not requested early refills.

7. On September 19, 2014 agents interviewed J.S., who was one of Opitz's steady customers. J.S. told agents that he regularly purchased about 15-20 kits of HGH from Opitz approximately three to four times a year. Opitz would deliver the kits to him personally. J.S. would pay in cash, about $6,000 for each transaction.

8. J.S. spoke to Opitz about buying HGH as recently as around August 26, 2014. J.S. received text messages[2] from Opitz on August 25, 2014 and August 26, 2014 stating that he wanted to talk. Agents viewed the text messages on J.S.'s phone. 908-246-9044

9. In response to these text messages, J.S. called Opitz around August 26, 2014. During the call Opitz told J.S. that he needed money. Opitz offered to sell J.S a large quantity of HGH. Opitz said that "John," a person unknown to J.S., would deliver the HGH for him. J.S. felt uncomfortable with the arrangement and declined Opitz's offer.

10. In addition, on October 8, 2014, agents executed a search warrant at Opitz's residence. When they executed the warrant, agents found a cache of approximately 160 vials of HGH inside the residence. If Opitz had been using the HGH that he had been prescribed, Opitz should have had on hand no more than about 20 vials; instead, he had ten times as much. Agents also found notes with calculations regarding the sales price for large

---

[2] Texts were made from number 908-246-9044. Pursuant to a warrant authorized by Federal Judge Michael A. Hammer, District of New Jersey, on October 6, 2014, agents seized Opitz's cell phone with number 908-246-9044. They saw two calls placed from Opitz's phone on September 21, 2014. The calls, placed a few hours apart, lasted approximately 15 seconds. This evidence supports the reasonable, and likely, inference that Opitz was again soliciting J.S. to buy HGH.

quantities of HGH. For example, notes such as 400 * 48 kits = $19,200; and 425 * 15 kits = $6,275, among others. This high level of inventory, coupled with quantity and price calculations, establishes probable cause to believe that Opitz is selling quantities of HGH to persons in addition to J.S. while on pretrial release, in violation of 18 U.S.C. § 1347; and 21 U.S. C. § 333(e).

11. There is probable cause to believe that Opitz is involved in sales of HGH while on pre-trial release in violation of 18 U.S.C. § 1347; and 21 U.S. C. § 333(e).

12. The foregoing violations of 18 U.S.C. § 1347 and 21 U.S.C. 333(e) are felonies. Therefore, in accordance with 18 U.S. C. § 3148(b)(2)(B), there is a rebuttable presumption that no condition or combination of conditions will assure that the defendant will not pose a danger to the safety of any other person or the community.

13. The Court finds that based on the defendant's conduct in continuing to commit federal crimes; the defendant is unlikely to abide by any condition or combination of conditions of release. 18 U.S.C. § 3148(b)(2) (B).

Therefore, IT IS ORDERED that the defendant be committed to the custody of the Attorney General for confinement in a correctional facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal; that the defendant be afforded reasonable opportunity for private consultation with counsel; and that, on order of a Court of the United States, or on request of an attorney for the government, the person in charge of the corrections facility in which the defendant is confined deliver the defendant to a

United States Marshal for the purpose of an appearance in connection with a court proceeding.

Additionally, IT IS ORDERED that the defendant's bond in the amount of $50,000 is forfeited based on his violation of conditions of release.

BY THE COURT:

_____
ELIZABETH T. HEY
*Magistrate Judge*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 14-541 |
| ERIC C. OPITZ | : | |

## GOVERNMENT'S MOTION TO REVOKE BAIL

COMES NOW, the United States of America, by its attorneys, Zane David Memeger, United States Attorney, and M. Beth Leahy, Assistant United States Attorney, and respectfully moves pursuant to 18 U.S.C. § 3148(b) to revoke defendant Eric C. Opitz's bail for violating the conditions of his release by committing federal crimes.

### I. Factual Basis

1. On June 5, 2014, defendant Eric C. Opitz was arrested on complaint and warrant for health care fraud, in violation of 18 U.S.C. §1347; wire fraud, in violation of 18 U.S.C. §1343; mail fraud, in violation of 18 U.S.C. §1341; and the distribution of controlled substances, in violation of 21 U.S.C. § 841. The complaint was based on evidence that defendant Opitz sold, and attempted to sell, human growth hormone ("HGH") and anabolic steroids, a Schedule III controlled substance, to an undercover law enforcement officer in October 2013, December 2013, April 2014 and June 2014. The undercover agent responded to Opitz's advertisement for HGH on the internet site Craigslist. He told Opitz that he wanted HGH to build strength and muscle mass. Opitz obtained the HGH and steroids that he sold to the undercover agent through Medicare Part D.

2. Following his arrest on June 5, 2014, defendant Opitz was released on $50,000 O/R bond and other conditions, including that he would not commit federal crimes

during the period of release.

3. On October 8, 2014, an indictment was unsealed, charging defendant Opitz with health care fraud, in violation of 18 U.S.C. §1347 (10 counts); mail fraud, in violation of 18 U.S.C. §1341 (3 counts); the distribution of anabolic steroids, a Schedule III controlled substance, in violation of 21 U.S.C. § 841 (3 counts); and the distribution of human growth hormone, in violation of 21 U.S.C. § 333(e) (4 counts).

4. Further investigation since Opitz's arrest on the complaint and warrant has revealed that his criminal conduct was more extensive and more dangerous than previously known, and may have involved children. For example, in a recorded conversation on May 30, 2014[3], Opitz told an undercover agent that he sold HGH to a 12 year old girl.

5. While on pre-trial release, Opitz continued to defraud Medicare and put the public at risk. In early September 2014, agents became suspicious after learning that Opitz had tried repeatedly to obtain early refills of his HGH prescriptions. According to Special Agent Gene Fayer, HHS-OIG, based on his experience, individuals who sell their prescription drugs often attempt to obtain early refills because they are aggressively selling and have run out of "inventory."

6. Between June 12, 2014 and September 10, 2014, Opitz contacted Highmark Inc., a Medicare Part D provider, and/or Walgreens Specialty Pharmacy, who in turn contacted Highmark, approximately 15 times asking for HGH to be delivered to him ahead of the 30 day auto ship schedule. Prior to this, Optiz had not requested early refills.

7. On September 19, 2014 agents interviewed J.S., who was one of Opitz's

---

[3] Call transcribed on or about September 22, 2014. Transcript will be available for the Court at the revocation hearing scheduled for October 10, 2014.

steady customers. J.S. told agents that he regularly purchased about 15-20 kits of HGH from Opitz approximately three to four times a year. Opitz would deliver the kits to him personally. J.S. would pay in cash, about $6,000 for each transaction.

8. J.S. spoke to Opitz about buying HGH as recently as around August 26, 2014. J.S. received text messages[4] from Opitz on August 25, 2014 and August 26, 2014 stating that he wanted to talk. Agents viewed the text messages on J.S.'s phone.

9. In response to these text messages, J.S. called Opitz around August 26, 2014. During the call Opitz told J.S. that he needed money. He offered to sell J.S a large quantity of HGH. Opitz said that "John," a person unknown to J.S., would deliver the HGH for him. J.S. felt uncomfortable with the arrangement and declined Opitz's offer.

10. In addition, on October 8, 2014, agents executed a search warrant at Opitz's residence. When they executed the warrant, agents found a cache of approximately 160 vials of HGH inside the residence. If Opitz had been using the HGH that he had been prescribed, Opitz should have had on hand no more than about 20 vials; instead, he had ten times as much. Agents also found notes with calculations regarding the sales price for large quantities of HGH. For example, notes such as 400 * 48 kits = $19,200; and 425 * 15 kits = $6,275, among others. This high level of inventory, coupled with quantity and price calculations, establishes probable cause to believe that Opitz is selling quantities of HGH to persons in addition to J.S. while on pretrial release, in violation of 18 U.S.C. § 1347; and 21 U.S. C. § 333(e).

---

[4] Texts were made from number 908-246-9044. Pursuant to a warrant authorized by Federal Judge Michael A. Hammer, District of New Jersey, on October 6, 2014, agents seized Opitz's cell phone with number 908-246-9044. They saw two calls placed from Opitz's phone on September 21, 2014. The calls, placed a few hours apart, lasted approximately 15 seconds. This evidence supports the reasonable, and likely, inference that Opitz was again soliciting J.S. to buy HGH.

## II. Defendant's Pre-Trial Release Should Be Revoked

Title 18 U.S.C. § 3148(b)(1)(A) requires only that the government show "probable cause to believe that the person has committed a Federal… crime while on release." Based on the evidence above, there is probable cause to believe that since June 5, 2014, Opitz has continued to commit health care fraud and to sell HGH, in violation of 18 U.S.C. § 1347; and 21 U.S. C. § 333 (e); 18 U.S.C. § 3148 and the express terms of his release.

Pursuant to 18 U.S.C. § 3148(b), "[i]f there is probable cause to believe that, while on release, the person committed a Federal … felony, a rebuttable presumption arises that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or the community."

The defendant has continued to commit federal crimes which involve the very acts that were the bases of his initial arrest on complaint and warrant. Not only does he continue to defraud the government, he puts the public at risk by distributing drugs to any interested buyer, including children. HGHs are prescription drugs because of their toxicity and their potential for harmful effects. HGH is not safe for use except under the supervision of a practitioner licensed by law to administer such a drug.

There is no reason to think that Opitz will be deterred from continuing his efforts to abuse the government systems, and put other's health at risk, whenever he believes it will profit him.

In light of this history, no combination of conditions can assure that the defendant will refrain from committing further criminal acts or forego whatever he perceives as a chance to

make a quick profit. Since his principal means of such income for years had been fraud, and since he has committed additional criminal violations to achieve his short-term financial goals, there appears to be no condition or combination of conditions that will ensure that he acts legally, and the defendant is thus unlikely to abide by any condition or combination of conditions of release. 18 U.S.C. § 3148(b)(2)(B).

The defendant suggests that he has serious medical issues that would put his health at risk if he were to be detained. However, Opitz does not appear to let his medical issues curtail his gambling or travel plans. Indeed, records obtained from the Sands Casino in Bethlehem, Pennsylvania show that Opitz is a regular patron. In 2014, he gambled at the Sands no less than 12 to 19 times each month; typically paying Blackjack for over an hour. Further, the defendant traveled to Las Vegas for an arm wrestling tournament in May 2014. He also bragged to an undercover agent that he works as a physical trainer for " a lot of people on the side." While some of Opitz's health issues may be serious, they appear to be manageable based on level of activity.

WHEREFORE, the government respectfully requests that its Motion to Revoke Bail be granted.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


 /s/ M. Beth Leahy
M. BETH LEAHY
Assistant United States Attorneys

# CERTIFICATE OF SERVICE

I certify that on this day I caused a true and correct copy of the United States' Motion to Revoke Bail by electronic filing and first class mail on the following:

Rossman Thompson, Esq.
Federal Defender Association

    /s/ M. Beth Leahy
M. BETH LEAHY
Assistant United States Attorney

Dated: October 9, 2014